Before I start, I would like to say one thing. I am extraordinarily hard of hearing. I've got all of the high tech available to me and to the court, but because of my hearing loss, some words don't process, which means I sometimes can't hear your questions or understand your questions long enough before you, not to ever duck a question. It's just that it doesn't process, which is kind of why this is probably my last argument before you. Understood. You may proceed. Thank you. Michael Bigelow, your Honor, on behalf of Olga Palamarchuk. I'm going to try to quit at five minutes and give another minute to one of my colleagues here because there's a lot to cover. I want to cover two topics. The first I want to cover is harmless error, which is sort of the tag end of all of this, but I want to do that. Then the second one I want to try to cover is sufficiency of the proper, about which I think you will probably have, you may have some questions. I beat both to death in my separate brief, but a separate joinder at least. As to harmless error, I think we agree. We agree that Lindsey Holtz, I don't necessarily agree with it, but we agree that materiality is defined as a statement capable of influencing people, and per Lindsey it's evaluated under an objective standard. It's not a subjective personal perspective of anybody. I think we agree to that. The only admissible evidence then, according at least to Lindsey, is an objective standard of materiality. That's it. Nothing else to prove materiality. The manner in which an entire industry, according to Lindsey, from that we may well ascertain what is and is not material within the industry, which would include the specific lenders in this case, but we've got to extrapolate down to that. We also, I think, agree the whole thing is a jury question. It's not a matter of law. It is a jury question, and it's a jury question from, now, okay. It's a question that has to the jury, submitted to the jury, that has nothing to do with a subjective perspective of what is and is not material. I agree with that. I think that's what Lindsey holds. I don't agree that that's correct. I want to make that very clear. I don't want it showing up in the opinion that counsel conceded Escobar does not glide, because I don't. Fair enough? All right. But the government, and actually the court, can't have it both ways. You can't have us, the defendants, focusing on an objective standard, and then we get to prosecution that says, ladies and gentlemen, you can rely on their subjective perspective in order to determine whether or not it is mandatory. And by the same token, your honors, when you start looking at harmless error and saying, yeah, the government beyond a reasonable doubt, that the error, I'm assuming that it's an error, further below. But anyway, the error is harmless because there is, whatever Nader said, substantial evidence of justice, the judge was part, said that, yeah, there's just all kinds of evidence that it was material. The question then becomes, when you're dealing with harmless error, what does the court look to? What does the government look to to prove beyond a reasonable doubt? In this case, they're relying exclusively on a subjective perspective that, yeah, ladies and gentlemen, look at what all of these lender witnesses said. Yes, it's significant. Yes, it matters to us, with one exception, which I point out, which is we don't know if it matters or not. They're relying on a subjective perspective from the lenders. The court, in this case, what would the court rely on? What would the court have to rely on to make a determination that beyond a harmless? What are they going to look to? They're going to look to only the subjective belief of the lenders. All right. So I don't think that the error was harmless. Let's go to Proffert. The defense, Proffert, although nobody is willing to concede it, that they wanted to present evidence part knowing that industry standards was going to be presented to the jury. Yeah, there may have been some talk about lender conduct. In fact, there's one sentence in the document they file in support of their motion in limiting. And that was at 1486, somewhere along the line. They say, yeah, defense is focused on conduct of the lenders. Well, okay. The trial judge can say, no, it's not admissible. You can't admit that. Well, what about the other stuff? Well, you could Absolutely not. Nowhere along the line did we get a chance to present anything close to the defense that industry standards mattered. And with that, I'm done. Unless you've got questions. Thank you, counsel. Thank you. Mr. Warner, I saved you six seconds. Sorry. May it please the court, Alexi Haller representing Defendant Appellant Vera Zira in this appeal. I would please like to reserve two minutes for rebuttal. I would like to make a few points about the materiality issue. First, this case should not turn on whether or not the proffer was sufficient. And in this regard, I would draw the court's attention not only to the proffer itself at 647-648 of the excerpts of record, but specifically to the opposition to the government's motion in limine, which the court will find at 1480-1496 of the SCR. And that excerpt of record, or sorry, that opposition makes it extremely clear that the defense was proffering this expert for industry-wide and for lender specific materiality. So for both. And so that is a critical document to look at. As I understand it, counsel, your defense, the defense presented at trial was that the statements made to obtain these various loans, which as I understand it, you concede are false, didn't matter because the loans were being made on the value of the property, the collateral, whatever, and that this was common in the industry in this time frame. Is that accurate? That's pretty accurate. Correct. During this, this is at the height of the time of the liar loans and the fraud that was prevalent with regard to the lenders in particular. Was there anything to prevent the defense from calling the actual loan officers involved in these transactions to see if they would admit that that was the case? Well, some of the lender did have witnesses at the trial and they were asked questions by the government with regard to, you know, would this be significant to you, you know, the income and so forth. But the defense wasn't allowed to show then in response, wasn't allowed to cross-examine them to show that, you know, in fact that the practice of the lending institution itself was, basically, it didn't really matter. All they wanted to do is get these loans through as fast as possible. And the numbers themselves, you know, the answers didn't matter to the lending institutions. All they cared about was getting their commission and then, you know, passing on the loan to a secure, you know, to become securities, essentially. So, I think the defense was actually closed off through the eliminate proceedings and not allowed to, and you could look at some of the times where they tried to go there with the witnesses, with the lending institution witnesses, and the court, district court, just shut it down and said, come on, it's not relevant. Let's move on. You know, I ruled on this. It's not relevant. What was determined to be not relevant was industry practices, correct? Both. I mean, the district court didn't allow them to go into either one, either the industry practices or with regard to the specific practices of the lenders at issue. In some instances, isn't it correct that some of the verifying information in connection with these loans was actually done by the defendants in this case? I'm not sure what you mean by the verifying. Well, wasn't there some verification of actual interviews of the applicants where one of the defendants forged the name of the actual interviewer? That sort of thing was going on, correct. But, you know, the defense position was that it was still not material because these lenders basically didn't care one way or the other. And, you know, the government was able to present this evidence saying, well, these lenders did care and present these lenders as basically innocent victims, but that's not at all the case. It's not all the truth. So you're saying that Lindsay is wrongly decided? Because Lindsay says that, and I'm quoting, evidence of individual lender behavior is not admissible to disprove materiality, but evidence of general lending standards in the mortgage industry is admissible to disprove materiality. So I understood the district court's order to be that the proffered expert was only going to talk about the conduct of the alleged victim lenders and so excluded it under Lindsay. But you seem to be saying that that was incorrect, that that evidence was relevant and admissible. This is a matter, in my view, just basic fairness. I mean, Lindsay did not involve a lender-specific theory by the government. This case involved the government relying on a lender-specific theory at trial. And as a matter of due process, basic fairness, right to cross-examine, right to impeach the witnesses, the defense had a right to go against that, to show why that testimony was not correct. And so I don't think that Lindsay is directly— if Lindsay had involved a lender-specific theory used by the government at trial, I think the argument would be more problematic. But clearly here, the government relied on a lender-specific theory, not only through the testimony of the witnesses, but also during the closing argument at E.R. 527 to 528. Clearly, the government is talking about whether or not this was material to the specific lenders. And they can't have it both ways. You know, if they rely on a specific lender theory at trial, kind of what's good for the goose is good for the gander. The defense should be able to show why, as to the—from the perspective of these specific lenders, it was not material information. So I understand your answer to be that, yes, you think Lindsay was incorrectly decided. It's a decision of this Court from 2017. And this panel can't reverse that or disregard it. I'm saying that it actually—I'm not—I mean, I do personally think it was incorrectly decided, but I don't think that it applies here, because Lindsay did not involve a lender-specific theory by the government at trial. That's a distinction. From reading the opinion, I see no evidence in that opinion that it was a lender-specific theory. So, you know, here, the defense wanted to introduce both the lender-specific and industry-wide, and they were completely shut down on both. And that is why it was erroneous. If I may, just since I only have about a minute left, I would like to mention, with regard to the mailing issue, you know, this is a pretty significant case with regard to the mailing issue, because the District Court departed from this Court's model jury instructions and included the notion that the mailing only needed to be incident to an essential part of the scheme. And that allowed the jury to—basically, even if the mailing were just incidental to the scheme, that would be sufficient. And it allowed the jury to draw that conclusion. But that's directly contrary to Supreme Court precedent. I mean, the Supreme Court precedent says merely incidental and collateral mailings are insufficient under the statute. And that's— Wasn't the deed of trust mailed for the purpose of recording? The deed of trust was mailed, but this is after the disbursement of the funds. And so it was not a core part of the scheme. The scheme did not depend on the mailing in that respect. I see that I've only got two minutes left in terms of rebuttal. Thank you. Good morning, Your Honor. Tim Warner for Mr. Bondaruk. We'll shift gears. I'm not going to address the materiality stuff. I wanted to talk about the improper admission of statements made by Ms. Palomarchuk to Ms. Kizlitza that were extremely prejudicial to Mr. Bondaruk. The court admitted these statements under the theory that they were against penal interest. The Williamson decision requires that the court engage in parsing of those statements, which requires an individual, factual, specific factual evaluation of each of these statements. And I do not see that that parsing occurred. My evaluation of the record is that the court basically, in bulk, allowed these statements to come in that were very prejudicial to Mr. Bondaruk. These statements included things where Ms. Palomarchuk would call Mr. Bondaruk a bum. She would comment on his binge drinking, on his gambling. She referred, very prejudicial to him, referred to burying gold and money and losing money gambling. She referred to him as greedy. These statements, not only were they inflammatory, they were really blame, they were blame shifting statements in there. And they were statements that are relating to him only and not her criminal conduct. Discussions of pawning a diamond bracelet. And I think particularly harmful to him, his theory, he was a straw buyer. His theory was that he was an unknowing straw buyer and was essentially directed by Palomarchuk who had that industry knowledge. But at trial, didn't Mr. Bondaruk argue that the entire transcript of Ms. Palomarchuk's statements should be admitted because his theory was that she was him. And so he wanted all of these statements to come in to show that she shouldn't be believed because she really just didn't like him and was saying bad things about him, calling him a bum, et cetera. Right. Your Honor, I think the flow of this issue, the first thing that counsel wanted, is the counsel objected to the statements on the basis that they were prejudicial, on the basis they violated the confrontation clause, on the basis that they were hearsay. So they objected to the statements in total. And then the district court had the entire transcript, reviewed it, and determined that Ms. Palomarchuk's statements were against her penal interest because she was making admissions to illegal conduct and so ruled that those statements were coming in. And then at that point, if I understand the record, Mr. Bondaruk's counsel wanted the entire statement admitted. So why are we not now for plain error? I guess counsel, once the statements were in, the statements were in, defense counsel had to deal with that. There were a number of harmful statements that I've discussed. But what counsel didn't do was say, all right, Your Honor, you've agreed that these statements are against Ms. Palomarchuk's interest, but these particular statements, can you excise them? And said counsel did the opposite and said, I want all these statements in. Is that correct? During the discussion, the initial position was to exclude the statements. During that statement, the court allowed them in. Then counsel, I agree that the counsel did request that more statements come in so that she could address them in cross as a prejudice, confront the witness with the prejudice. That's true. At that point, she wanted the statements to come in, but it was only because they were going to come in because she'd lost her initial desire to exclude the evidence. But what was coming in was Ms. Palomarchuk's other statements about herself and her activities, which implicated Mr. Bondurak. So do you agree that we'd be reviewing this issue for plain error? I don't, actually, because the only reason defense counsel then asked for them to come in more complete statements to come in is because she'd already lost that initial gambit of trying to exclude the statements. So she had no choice at that point but to be able to use the statements during cross to show prejudice. Go ahead. I'm sorry. I'm going to shift gears just in the last final seconds, and I think Mr. Bigelow said I could borrow his time. It's not much, but would that be all right? Okay. Make your point quickly, then. Okay. On the issue of the defendant, the law says that each defendant, the government has to prove that each defendant knew that his or her benefits were probably dependent upon the success of the entire operation. And I think where this issue comes in is that it would be Kuzmenko and Giri, okay? They were involved in separate transactions involving separate houses, separate transactions. But your client earned rental income from a house purchased with a mortgage where the application said he was going to live there as his primary residence. Right. And this argument goes to count one, which is the overall conspiracy, and that's what's being disputed. So my position is that that has not been the overall conspiracy encompassing all the defendants has not been proven because Giri on one hand and Kuzmenko on one hand did not know about each other, and the success of the money that they received is in no way dependent upon the other property transaction. Their money came from the escrow. There would be no belief or no reason to think that their success depended upon some other transaction that there's no evidence they knew of in the first place. Thank you, counsel. Thank you. We'll hear from the government. Good morning. May it please the court, Lee Bickley on behalf of the United States. I was trial counsel in this case. I'm going to start with a question from Judge Hawkins. I believe you asked one of the defense attorneys whether the defendants could have called lender representatives in this case. They most definitely could have. The defendants were able to challenge the government's evidence. They could have called witnesses from these lenders. In fact, the United States in our motion in limine specifically said there are in contrast witnesses who would know what actually happened at these institutions. They are the individuals who worked at the court. The court specifically at SCR 39 to 41 suggested that defense witnesses from the companies would be better witnesses. That goes to the beginning of why this expert was irrelevant and why the trial court in this case did its job. The trial court held that what it was excluding was what Lindsay says is allowable here. The trial court said the government moves that the court exclude evidence or argument that the mortgage lenders in this case were negligent in verifying information on loan applications or that the lender knowingly allowed borrowers to submit fraudulent loan application. I've indicated that those are irrelevant. The defendants in addition have made no showing as to how Mr. Partnoy has reliable knowledge of the practices of the lending institutions actually involved in this particular case. This would be in contrast to employees or officers of these institutions. And then the court also went further and said if the government had opened the door, the defendants should come back and discuss that. They never did. The district court properly excluded expert that was to testify regarding the negligence and intentional regard of specific lenders in this case and not general lending standards in the mortgage industry. The defendants in their notice specified that the evidence that they were going to present were about the lending institutions. They defined lending institutions as the alleged victims in the indictment. That's at ER 648. They defined lending institutions in this manner because the expert was not going to present evidence of the lending industry standards of the entire mortgage industry. They never said that they were going to do that. Well, he did say that Professor Partnoy would be testifying as to the securitization process and what financial market during the time frame outlined in the indictment. But, Your Honor, that doesn't mean lending standards in the entire industry. They didn't talk about how they were going to present evidence with respect to income or the primary residence representation that Mr. Bondarek had to make. The defense theory was that this expert testimony should be allowed because it overall practice in the lending industry, the jury would be free to disregard the testimony of the people who actually made and approved the loans. Does that summarize it? No, Your Honor, it does not. The defense theory in this case was that these specific lenders were negligent and intentionally disregarded some of the representations. It was not about the general industry. Their notice was very specific to the lending institutions and the court in its ruling specifically talked about that the lenders in this case and what the United States was asking to move and eliminate to exclude was respect to the lenders in this case. So, that's what was excluded. It was not general lending practices in the entire mortgage industry. And that's what we were dealing with. And Lindsay makes clear on page 1017 that what is allowable is evidence concerning the weight the entire mortgage industry gives to the type of statement. It uses the word entire. That is just not what the defendants in this case were doing. Well, if, for example, hypothetically, the proffer had ended with the description of the time frame, in your judgment, would that have been an acceptable expert testimony? I think what they would have had to proffer was we are going to talk about general lending standards in the entire industry. Well, when he says securitization process, that necessarily encompasses that, doesn't it? No, Your Honor, I don't think that securitization process is one aspect to it, but it's not broad enough and it doesn't link it to exactly what the general lending standards they wanted to present are. You know, it talks generally about securitization, but it's a broad statement and doesn't link it to the representations that they'd be going into and how they are generally applied in the mortgage industry in its totality. In addition, if the court finds that there's any harmless error with any argument, any error was harmless. First, as Judge Berzon said in the Kuzmenko case, Partnoy was not going to testify that representations such as primary residency and income did not have a natural tendency to influence. The defendants lied about the core mortgage information here. We had a lender representative testify, and this is respect to with respect to investment properties or secondary homes. That's materiality, and nowhere in Partnoy's in their nowhere with respect to Partnoy's disclosure was it ever challenged that, you know, he would say that it didn't matter whether the primary occupancy box was checked or what the income was that was on the application. And with respect to the evidence we presented with respect to the lenders, we focused on the words on the application. We were talking about that the primary residency box had to be checked. And the defendants themselves in both their opposition to the motion in Limine and in their motion for acquittal said all that at SCR 12. That's admitting materiality. Partnoy was not going to be coming in here and saying that a box didn't have to be checked or a certain income on the application didn't have to be put there. And so consequently, even if the proffer testimony had been admitted, no jury could reasonably found that the defendants did not make material misrepresentations. And also with respect to harmless error, the defendants themselves believed that these representations were material. They made big lies and they supported them with false tax returns, with false letters of employment, with, you know, false profits and loan statements. They realized, and Ms. Pellermarchuk was a loan officer, so she realized that the representations here were materiality. Regardless of what Partnoy testified, the jury would have been aware that in this case, these representations were material. In addition, the defendants were specifically told that the primary residency occupant representation was material. You know, in each of the deeds of trust, Mr. Bondirect was told that that is a material representation and he signs those deeds of trust. And the lenders were required supporting material and the lenders repeatedly asked for this material. And what the court should also focus on is that despite the court's ruling regarding some of the evidence, the defendants still presented a defense that these lenders were negligent and intentionally disregarded. They repeatedly cross-examined all these lender representatives about, you know, what they checked, what supporting information they needed, so they were able to make that argument. So looking at the nature of this expert's testimony, and that's specific in terms of what this expert in this case was going to do, the fact that the defendants were able to present a defense and the overwhelming evidence materiality, we would argue that any error was harmless. Now, with respect to the mailing, the jury instruction follows both the Supreme Court and this court's words. The Supreme Court is held to be part of the execution of the fraud. The use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme. This court has reached a conclusion that the district court was just repeating the words of the Supreme Court and this court. Counsel, why did the government request an instruction that differed from the Ninth Circuit model jury instruction on mail fraud? Because it's an accurate statement of the law, and we believe that the jury was entitled to know what the law is, and the judge felt that it was an accurate statement of the law, and so he put it in to the jury instruction. And the Sixth Circuit has held that a similar instruction was adequate, and in addition, if you look to the Seventh Circuit, it is part of their jury instruction, although it uses the word incidental as opposed to incident. And the word incident to an essential part of the scheme is exactly what the Supreme Court has told us what the law is, so we think that the instruction was adequate, and that should not be a basis for reversal in this case. We haven't talked at all about sentencing. Do I understand correctly that the government concedes that Bondurak has to be remanded for re-sentencing? Yes, Your Honor. Let me ask about Ziri. Am I pronouncing it correctly? You are. Okay. The niece. Yes, she. She's. Yes. Why isn't, most nieces are, why isn't she entitled to a minor role adjustment? Well, the first answer would be, according to Application Note 2C, you need to, when you're deciding on any role adjustment, that would be for, you know, a upwards or downwards, that you consider the money laundering count. She was sentenced under the 2S provision, and she was sentenced for her count for money laundering. So under Application Note 2C, you need to look at her money laundering conduct. And she clearly, and the defendant does not even argue, would not be entitled to a downward departure for minor role. Because she funneled the money through to others? She helped create the money. So she was responsible for this lien that caused $100,000, this fake lien. She had it mailed to her house, so she created the money, and then she funneled it to Defendant Palomarczyk, and she also kept a significant chunk, more than half of it, for herself. And then the court also ruled with respect to the, if you look at her role in terms of the So both with respect to the money laundering and also with respect to the conspiracy, we would rule, we would argue that she was an average participant. Now, going on to Mr. Warner's arguments with respect to Ms. Kozlica's statement. Your Honor, Judge Bade, that you are correct. Bondrock wanted the entire statement in. Nobody here was arguing that the statement was not inculpatory of Ms. Palomarczyk. She was admitting to being involved in two mortgage fraud schemes in this case. The defendants never argued that the statements made by her concerning Bondrock or Kuzmenko were not inculpatory. They didn't even file an opposition to her motion in limine. At the motion conference on June 22nd, they didn't argue that any of these statements were exculpatory. And then once they, she realized, once Bondrock realized that the statements were coming in, he wanted the entire statement in. The court repeatedly had this statement in front of it. You know, time and time again, he had the exhibit in front of it. And we, the, Counsel for Bondrock even said, I believe that the conversation in totality is more complete because you have an ex-girlfriend talking about another girlfriend and basically complaining about her ex. That's at SCR 597. Not one of the defendants. We spent over an hour going word for word with the court about this statement. And again and again, they just wanted more in. They kept saying rule of completeness. We want more and more and more in. And we were trying to redact more out. So the idea that the judge did not know what he was doing with respect to this, that the defendants suddenly wanted more redacted is a little bit hard to believe, especially when you were there in that trial and spending all the time on this transcript. If the court holds, though, that any of those statements were erroneously admitted, we would argue that they were, that it was harmless error. With respect to Bondrock, which seems to be the focus of this argument, the United States, well, first of all, he wanted the entire transcript admitted. We never questioned Ms. Kaslica about these statements that he was, you know, a bum or greedy. We never focused on those statements in our closing or on our rebuttal. The individual who was focusing on those statements was the defendant Bondrock himself. Over the government's objection, Bondrock counsel questioned Ms. Kaslica about comments concerning him being a bum and other derogatory things she said. She even questioned Ms. Kaslica about things that weren't even in these exhibits. She went on to ask him whether Ms. Palomarchuk had called him a good-for-nothing, lazy, and worthless. So, and again and again, this became the focus of her defense, that Palomarchuk didn't like Mr. Bondrock, and she used the transcript in order to do that. And then, as we discussed in our briefs, the evidence against Mr. Bondrock was overwhelming. It was, the statements in the state, in Ms. Kaslica and Ms. Palomarchuk's recording was cumulative, and in addition, once it was determined that the transcript was coming in, you know, the defendant definitely wanted it in, all of it. With respect to the conspiracy, we would argue that this was sufficient evidence, and a rational juror could find that there was a single conspiracy in this case with respect to all of these defendants. They all profited from this conspiracy and this scheme, and so, and it was all dependent on the success of the entire operation. They all had their hands in this entire conspiracy, and any rational juror could have found that. If there are no further questions? Thank you, counsel. Thank you very much. Mr. Howler, you have two minutes. Thank you, Your Honor. I'll try to be quick here. With regard to the proffer not covering industry-wide standards, I would just like to refer to the opposition that I mentioned earlier, where the defense stated, the expert will opine, among other things, that the entire lending industry was, in fact, incentivizing its brokers, account executives, underwriters, and the borrowers themselves to obtain loans. The expert's testimony is critical in understanding the lending industry and the lenders during the time. That says SER 1495 and 1485-86. There's other examples in that brief. It's clear that the proffer extends to the entire industry. With regard to the harmlessness and Judge Berzon's concurring opinion in Kuzmenko, it's just plainly inconsistent with Escobar, and in Escobar, the Supreme Court said, if the government pays a particular claim in full, despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. That's precisely the problem here. That's the kind of evidence that we should have been able to present, and by not being allowed to present it, it was certainly not harmless. It deprived the defendants of really the only defense at trial. And, in fact, if you look at the Cherikov case, we have empirical evidence that this kind of expert testimony makes a huge difference. That is the case out of the same district involving the same allegations, and it resulted in acquittals for all the defendants. With respect to the cross-examination, the defense was just shut down on cross-examination, and whenever they got close to the fraud committed by the lenders, they were pushed off, and a great example of that is the ER 378 to 380. I also wanted to make a note from earlier, the deed of trust was not mailed for the purpose of recording. It was mailed after the recording, five to seven business days afterwards. I just wanted to make that clear for the record. I guess I'm out of time. Go ahead. You can make your last point. Okay. The last point is just regarding to the mailings. The incident to language does appear in the Supreme Court cases, but so does the language. Merely incidental mailings are not sufficient, and it's improper, in my view, to throw that kind of morass, doctrinal morass, at the jury and say, without telling them that incidental is insufficient. If you tell them incident two is sufficient, you should also tell them that incidental is not sufficient. As the Supreme Court said in the household credit case, incident two is ambiguous. It's hard to tell if it's a remote connection or a substantial connection that's required, and that allowed the jury to reach its verdict based on an inadequate legal theory. Thank you, counsel. Thank all of you for your arguments this morning. The case just argued will be submitted for decision, and we will be in recess for the morning.
judges: Thomas, Hawkins, Bade